# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PAMELA MONTGOMERY BECKHAM, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 08-172 (RMC) |
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Pamela Montgomery Beckham sues the National Railroad Passenger Corporation ("Amtrak") for alleged race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* Ms. Beckham complains that she was discriminated against when Amtrak denied her tuition reimbursement for a master's degree program, web design software training, and her requests to work from home. Furthermore, Ms. Beckham complains that such actions were taken in reprisal for her participation in a Title VII class action against Amtrak. Having reviewed the parties' briefs, exhibits, and the entire record, the Court finds that none of these decisions rises to the level of a legally cognizable adverse action to support the allegations of disparate treatment discrimination. The allegation that Amtrak retaliated against Ms. Beckham also fails for lack of evidentiary support. Summary judgment will be granted to Amtrak.

# I. FACTS

Ms. Beckham is an African-American woman who has been employed by Amtrak since 1989. She was initially hired as a Train Attendant and has been promoted to a number of different positions over the years.[1] In 1995, Ms. Beckham became a Service Manager, where David Nogar was in her supervisory chain, although not as her direct supervisor. In September 1999, Mr. Nogar transferred to a new position with Amtrak in California. When this suit was filed in 2008, Ms. Beckham was working as a Senior Analyst in Amtrak's Transportation Department in Washington, D.C.[2]

In 1998, Ms. Beckham joined a class-action lawsuit against Amtrak that charged the railroad with race discrimination; at the time, her name was Pamela Montgomery. *See McLaurin v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 2d 61 (D.D.C. 2004). The suit was resolved in November of 1999, through a consent decree which continued in force until 2004. Ms. Beckham received monetary relief from the decree to compensate for a salary disparity that existed between African American and Caucasian employees. The decree named Thom Chawluk as a manager who allegedly discriminated against the protected class members. Mr. Nogar was Thom Chawluk's immediate supervisor at some point during the *McLaurin* class action.

In December 2002, Mr. Nogar returned to the East Coast as the Senior Director for

---

[1] Ms. Beckham has worked as a Sleeping Car Attendant, Service Attendant, Lead Service Attendant, Food Specialist, Assistant Conductor and Conductor until 1995, when she became a Service Manager.

[2] The Senior Analyst position was located in the Service Delivery Department in Wilmington, Delware, until 2007. The position was then transferred to Amtrak's Transportation Department in Washington, D.C., where Ms. Beckham remained until at least the time of filing the instant complaint.

Amtrak's Department of Service Delivery Standards ("Service Delivery") in Wilmington. As a Senior Analyst in Service Delivery, Ms. Beckham worked directly for Mr. Nogar, starting in approximately 2002 and continuing until January 2005, when Monika Sloane joined Service Delivery as Director of Service Standards and Operations. Ms. Sloane supervised Ms. Beckham until late 2006, after which Ms. Beckham's position was moved to the District of Columbia. Ms. Beckham did not discuss the *McLaurin* class action with either Mr. Nogar or Ms. Sloane.

Ms. Beckham contends that Mr. Nogar knew of her involvement in the *McLaurin* class action as he had been Tom Chawluk's immediate supervisor. Pl.'s Mem. in Opp'n. ("Opp'n."), Ex. 1 ("Beckham Decl.") ¶ 3. Mr. Nogar's name does not appear in the *McLaurin* complaint. Mr. Nogar supervised a contract commuter operation for Amtrak in California from September 1999 through December 2002 and testified in deposition that he "didn't know anything about that class action suit until after I came back and assumed my job as senior director of service delivery in Wilmington." Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Mem."), Ex. 3 ("Nogar Dep.") at 64–65. Mr. Nogar learned at some point that Ms. Beckham had been a plaintiff in *McLaurin*. *Id*. at 64. Mr. Nogar "didn't think [the suit] impacted me one iota because — certainly with respect to Ms. Beckham, because the class action suit would have occurred when she was employed as a service manager for Northeast Direct product line. I actually recruited Ms. Beckham. I gave her her first management job. And I also provided her with a lot of training in those days, and so I had no reason to believe that if she was part of that suit that it would have anything to do with me." *Id*. at 65–66.

The functions of Service Delivery are to create, publish, and update the Service Standards Manual for onboard and train service employees; publish service standards for station

employees; administer the uniform contract nationwide; perform quality assurance work; and assist in the implementation of special service initiatives by doing train riding, as needed. As a Senior Analyst in Service Delivery, Ms. Beckham's chief duty was technical writing[3] for Service Delivery's primary objective: the Service Standards Manual. Her responsibilities included technical writing for the service standards, the operations standards updates, and the operations service advisories. Additionally, Ms. Beckham was responsible for information relating to the Service Standards Manual that would be uploaded to Amtrak's intranet, an internal website for employees. Amtrak's Information Technology department would upload new or additional material to the intranet at Ms. Beckham's direction. Ms. Beckham vaguely contends, however, that at an unspecified time period her responsibilities included Internet responsibilities. *See* Opp'n., Ex. 1 (Plaintiff's Statement of Genuine Issues) ("Pl.'s Disputed Facts") ¶ 1 ("Ms. Beckham's responsibilities did include responsibilities for the internet.").[4]

Ms. Sloane has a graphics design background and was hired in part to develop a web-based site for Service Delivery employees, thus keeping work in-house and eliminating the costs of contracting with outside firms for design and management of an Internet site. Russell Fox joined

---

[3] The duties of a "technical writer" were "to write the service standards, the operations standards updates, and the operation service advisories that were published." Nogar Dep. at 95. Also included was the duty to make revisions, as needed, to the service standards manual. *Id*. at 96.

[4] To support the proposition that her responsibilities included the Internet, Ms. Beckham cites an Amtrak Position Description for Program Manager. *See* Opp'n., Ex. 2 (Position Description). Ms. Beckham also states that she was assigned to "manage one of the largest technology programs in Amtrak's department of transportation, the Transportation Department Review System (TDRS)," which brought her into constant contact with Amtrak's Information Technology ("IT") department. Beckham Decl. ¶ 7. Ms. Beckham does not say that the TDRS system operated on the Internet. Ms. Beckham testified that she wanted to take the master's degree courses in 2004 because at the time she was "maintaining Amtrak's Internet site." Def.'s Mem., Ex. 1 (Dep. of Pamela Beckham) ("Beckham Dep.") at 33.

Service Delivery in 2004 after a lateral move from a separate Amtrak department. He was Ms. Beckham's counterpart as a Senior Analyst and shared responsibility for technical writing and updating the Service Standards Manual. Mr. Fox came to Service Delivery with a background in web design. Mr. Nogar had a goal of developing an external website for Service Delivery employees, accessible from outside the Amtrak intranet. According to Mr. Nogar, Mr. Fox and Ms. Sloane were also tasked with designing and maintaining the external Amtrak website based on their previous work experience. Thus, Mr. Fox was responsible for the development and maintenance of the external website and Ms. Beckham was responsible for maintaining the intranet, or internal, site for Service Delivery employees. Their core responsibility, however, remained the Service Standards Manual. Both Ms. Beckham and Mr. Fox reported to Ms. Sloane.

### A. Tuition Reimbursement

Amtrak has an Educational Assistance Program whereby it approves tuition reimbursement to Amtrak employees for courses that are likely to assist the Amtrak employee in improving her skills relevant to the performance of her job duties. When Mr. Nogar became Ms. Beckham's direct supervisor in 2002, Ms. Beckham was pursuing a bachelor of arts degree from Cabrini College pursuant to the Educational Assistance Program. She took courses at Cabrini and received tuition reimbursement through 2004, when she earned her bachelor of arts degree.

In 2004, Amtrak reimbursed Ms. Beckham for the last part of her undergraduate degree, and Mr. Nogar separately authorized her attendance at an Effective Business Writing Course, Editing and Proofreading/Grammar Course and Technical Writing Course at The Business Development & Training Center in Malvern, Pennsylvania. Both parties agree that her courses at Cabrini and BDTC helped Ms. Beckham with her technical writing responsibilities. Ms. Beckham

later applied for reimbursement for an Adobe Photoshop course she took at Villa Julie College, after she had completed the course. Mr. Nogar approved the tuition reimbursement but advised Ms. Beckham that she needed to submit such requests for approval in advance of a course so that Amtrak could assess whether the course would benefit her and Amtrak.

In July 2004, shortly after earning her bachelor's degree, Ms. Beckham asked Amtrak to approve tuition reimbursement for master's degree courses in Business and Technology Management at Villa Julie College. Ms. Beckham submitted her request to Barbara Hancock in Amtrak's Office of Career Development. Ms. Hancock sought Mr. Nogar's assessment of Ms. Beckham's application, *i.e.*, whether the courses were relevant to Ms. Beckham's job, as is required under the Program for graduate-level courses.[5] After discussing the course materials and Ms. Beckham's stated reasons for seeking the specified master's degree, Mr. Nogar responded that he did not believe the proposed courses were sufficiently related to Ms. Beckham's job functions. Ms. Hancock then decided to deny Ms. Beckham's tuition reimbursement request. Ms. Hancock informed Ms. Beckham that Mr. Nogar did not believe the master's degree courses from Villa Julie College were necessary for her job.

Ms. Beckham's request for tuition reimbursement for a master's degree was the first and only time Mr. Nogar had been involved in making a tuition reimbursement decision. Mr. Nogar never had another employee request reimbursement. Thus, he had never approved or denied tuition

---

[5] Under the Educational Assistance Program, coursework towards an undergraduate degree must be "[d]irectly related to the employee's present position or [r]elated to career advancement within Amtrak; e.g., as provided through the Career Counseling Program or other formal counseling programs." Def.'s Mem., Ex. 6 ("Educational Assistance Program Policy") at 3.3. "[R]equests for advanced degree programs . . . must be directly related to the employee's present position and approved by the Director of Career Counseling Services." *Id*.

reimbursement for another Amtrak employee during his time with the railroad. It was also the first time that Amtrak denied one of Ms. Beckham's requests for tuition reimbursement. Amtrak typically receives tuition reimbursement requests from Amtrak employees nationwide for bachelor's degree courses, and Amtrak approves some requests and denies others. Amtrak does not receive tuition reimbursement requests as often for master's degree courses. In fact, for at least the last ten years, Amtrak has not approved a request for a master's degree reimbursement for a Service Delivery employee. Def.'s Mem., Ex. 7 (Stagger Aff.) ¶ 16.

### B. Dreamweaver

Amtrak utilized Dreamweaver, a web-site design program, to develop the external employee Internet site. Amtrak does not utilize Dreamweaver to maintain the intranet site. Mr. Nogar approved a training course on Dreamweaver I for himself, Ms. Beckham, Mr. Fox, and Ms. Sloane. In March 2005, however, he authorized Mr. Fox and Ms. Sloane to take the Dreamweaver II course but did not attend himself or authorize Ms. Beckham to attend. Ms. Beckham contends that this training was appropriate and necessary for her job and that she was denied training because of her race and/or in retaliation for her prior class action involvement. Mr. Nogar testified that he did not authorize Dreamweaver II training for Ms. Beckham because graphic arts were not part of her job, she had no background or experience in graphic arts, and because the intranet site — where her information was stored — was not based on Dreamweaver.

### C. Telecommuting

At least at the relevant time, Amtrak had no official telecommuting policy to allow employees to work from home or outside the office. A supporter of telecommuting, Mr. Nogar asked his superior if telecommuting would be permissible. His suggestion was rejected because Mr.

Nogar's superior believed that Amtrak's upper management would not approve a telecommuting recommendation. Thus, as a matter of company policy, telecommuting was not authorized. However, in practice, Service Delivery did permit employees to work from home on a limited basis. As Senior Director, Mr. Nogar himself did not handle telecommuting requests, but expected one of his two subordinate directors to do so. Ms. Sloane understood that there was no official policy to allow for telecommuting and that employees were not supposed to telecommute merely "at their convenience." Def.'s Mem., Ex. 4 (Dep. of Monika Sloane) ("Sloane Dep.") at 60–62. Thus, telecommuting was available only on a limited basis within the discretion of an employee's supervisor.

Ms. Sloane asked Mr. Fox to work from home on occasion when there was an ongoing intensive project so he could avoid the distractions of the office and work more efficiently. Mr. Fox did not ask to work from home; Ms. Sloane initiated his taking work home and had it approved by one of her superiors. Ms. Beckham contends that Mr. Fox admitted to her that he was allowed to work from home because of personal reasons, *e.g.*, to meet a contractor, but Mr. Fox and Ms. Sloane both testified that he used vacation leave when he remained at home for personal reasons. *See* Beckham Dep. at 62–64; Sloane Dep. at 66–67; Def.'s Mem., Ex. 5 (Deposition of Russell Fox) at 36–37. This dispute is not material to resolution of the motion for summary judgment.

Ms. Beckham argues she was denied her requests to work from home which she attributes to race discrimination or retaliation. Ms. Beckham testified that she was denied the ability to work from home "each and every time" she requested it, which she recalls had been "about three times." Beckham Dep. at 59. However, she could only specifically recall one of the times, which

occurred in "either 2005 or 2006," when she was denied the request to work from home on a day that an electrical company was scheduled to come to her house to evaluate fire damage. *Id*. at 59–61. Ms. Sloane denied the request. *Id*. at 61. Ms. Sloane, on the other hand, testified that on several occasions, Ms. Beckham called Ms. Sloane to inform her that she would be working at home and Ms. Sloane gave Ms. Beckham credit for those days and did not deduct the days working from home from her accrued vacation or sick leave. Sloane Dep. at 74–76. Ms. Beckham does not dispute these facts.

Ms. Beckham also requested and was allowed to change her work location on occasion.[6] However, at some point in 2005, Ms. Beckham asked to adjust her work schedule, prompting an October 3, 2005 memo from Mr. Nogar concerning, in part, Ms. Beckham's request to leave the office early on a regular basis. *See* Def.'s Mem., Ex. 11 (Oct. 3, 2005 Memo). Mr. Nogar had previously written a similar memo to Ms. Beckham, concerning Ms. Beckham's unilateral changes to her work assignments and her need to receive pre-approval for any work done at a remote office. *See* Def.'s Mem., Ex. 12 (Mar. 22, 2004 Memo).

In January 2006, Ms. Beckham filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disparate treatment based on race and/or retaliation for her previous involvement in protected activities, *i.e.*, her participation in the *McLaurin* lawsuit. Compl. ¶ 16. The EEOC investigated the charge and determined that reasonable cause existed to believe that Amtrak violated Title VII by discriminating and retaliating against Ms. Beckham. *Id*. ¶ 17. The EEOC attempted to resolve the dispute through mediation but Amtrak

---

[6] Ms. Beckham recalls that she was allowed to work away from the Wilmington office on two occasions, both in approximately 2004, while Mr. Nogar was her direct supervisor. Beckham Dep. at 65–66.

refused to participate. *Id*. ¶ 18. On October 29, 2007, the EEOC issued Ms. Beckham a Right to Sue letter. *Id*. ¶ 19. On January 29, 2008, Ms. Beckham filed this lawsuit alleging discrimination on the basis of race in violation of Section 703 of Title VII, 42 U.S.C. § 2000e-2, and retaliation for opposing unlawful discrimination in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3.[7]

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Id*.; *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable

---

[7] On July 21, 2009, the Court found that the Charge Questionnaire was too vague and circumscribed to constitute a complaint of a racially discriminatory failure to promote, and dismissed Ms. Beckham's failure-to-promote claim, which was otherwise untimely. *See* Mem. Op. [Dkt. # 26] & Order [Dkt. # 27].

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id*. at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id*. at 325. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id*. at 675–76. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

## B. Discrimination Claims

In this case, there are two distinct claims against Amtrak — race discrimination based on disparate treatment and retaliation due to prior protected activity. Each claim must be analyzed separately.

### 1. Disparate Treatment

Title VII prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin in hiring decisions, in compensation, terms, and conditions of employment, and in classifying employees in a way that would adversely affect their status as employees. *See* 42 U.S.C. § 2000e-16. Thus, a disparate treatment claim is established when an employer treats a member of a protected group less favorably than similarly situated others due to

an impermissible motive.   The case at hand is a disparate treatment suit.  Compl. ¶ 16.

There are two distinct manners in which to establish liability in a disparate treatment

claim.

> The employee's theory may be that the sole reason for the adverse
> action was discrimination and that the employer's proffered
> legitimate reason for the adverse action was pretextual.  Or she may
> pursue a mixed motive claim, in which she maintains that
> discrimination was one of a number of factors that motivated the
> adverse action.  In a single motive case, the plaintiff has the burden
> of proving by a preponderance of the evidence that the reason offered
> by the defendant is not the true reason for the adverse action and that
> the real motivation was intentional discrimination.  In other words, in
> a gender discrimination case, for example, the claim is that "but for"
> discrimination based on the employee's gender, the employer would
> not have taken the adverse action against her.  By contrast, in a mixed
> motive case, the theory is that there may be a mixture of legitimate
> and illegitimate motives for an employer's action.    Thus, the
> employee must prove by a preponderance of the evidence that she
> was terminated and that her sex . . . was "a motivating factor" for the
> adverse action. . . .   When an employee proceeds on such a mixed
> motive theory, once the jury has found by a preponderance of the
> evidence that discrimination was "a motivating factor," then the
> burden shifts to the defendant to prove to the jury, also by a
> preponderance, that the defendant would have made the same
> decision even if discrimination had not been a factor.

*Nuskey v. Hochberg*, Civ. No. 06-cv-1573, slip op. at 2 (D.D.C. July 26, 2010).[8]

---

[8] *See also Smith v. Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010).

> What is a pretext case?  It is a circumstantial case in which the
> plaintiff prevails by showing that the reason or reasons given for the
> employer's adverse action were spurious, which requires no specific
> showing of illegal animus toward the employee, but only a showing
> that the employer's reasons are false or otherwise unsupportable.
> Because the employer is in the best position to explain the
> termination, the jury is entitled to infer discrimination once the
> employer's explanation is proven false.  What is a mixed-motive
> case?  It is a case in which, although reasons for discharge are valid,
> *i.e.*, not pretextual, the plaintiff prevails by showing that,

In most cases, a plaintiff must first establish a *prima facie* case of racial discrimination by showing that "(1) [she] is a member of a protected class; (2) [she] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 144 (D.C. Cir. 2008) (noting that the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in employment discrimination cases). After a plaintiff puts forth a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employer's action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

In a disparate treatment suit, the D.C. Circuit has observed that it is usually not necessary to determine, at summary judgment, whether an employee presented a *prima facie* case of discrimination per *McDonnell Douglas*. In fact, once the defendant has "asserted a legitimate, non-discriminatory reason for the decision, the district court need not -- *and should not* -- decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). At this point the *McDonnell Douglas* framework melts away and the district court must only resolve whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated

---

> notwithstanding the validity of the employer's stated motives for its actions, still *a* factor — in combination with the valid factors — for the discharge was the motive to illegally discriminate. Given that the alleged pretextual motives are valid, this theory requires a showing of a specific illegal animus toward the employee that factored into the discharge, *i.e.*, not "direct evidence," but evidence establishing specifically an illicit motive.

*Id.*, at 339–40 (Jolly, J. dissenting) (emphasis in original).

against the employee on the basis of race, color, religion, sex, or national origin." *Brady*, 520 F.3d at 494; *see also Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009) (noting that once defendant offers a non-discriminatory reason for employment action, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory [or retaliatory] reason.") (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

### 2. Retaliation

Title VII's anti-retaliation provision, on the other hand, makes it unlawful for an employer to "discriminate against any of his employees . . . because [s]he has opposed any practice" made unlawful by Title VII or "has made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3(a); *see Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008). To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in Title VII protected activity; (2) she suffered from a materially adverse action; and (3) a causal connection exists between the protected activity and the employer's action. *Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006) (citations omitted); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–69 (2006).

Retaliatory acts are not limited to harms or acts "that are related to employment or occur at the workplace." *Burlington N.*, 548 U.S. at 57. However, the "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id*. at 67. A plaintiff must show that the employer's actions "would have been materially adverse to a reasonable employee." *Id*. at 57. Furthermore, an employer's actions must be harmful to the point that they might dissuade a reasonable worker from making or supporting a charge of

discrimination.  *Id*. at 68.  The Supreme Court has emphasized that the employer's action must be "materially" adverse because the statute protects an employee from significant harms and does not protect an employee from "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id*.  Thus, an objective "reasonable person" standard applies in order to avoid judicial determination of a plaintiff's subjective feelings.  *Id*. at 68–69.

However, the legal analysis applicable to claims of retaliation under Title VII — specifically mixed-motive retaliation claims — is now a subject of debate among the circuit courts.  *Compare Smith v. Xerox*, 602 F.3d 320 (5th Cir. 2010) (allowing for mixed-motive retaliation claims), *with Serwatka v. Rockwell Automation, Inc.,* 591 F.3d 957, 962–63 (7th Cir. 2010) (noting with approval *McNutt v. Board of Trustees*, 141 F.3d 706, 709 (7th Cir. 1998), which prohibited mixed-motive retaliation claims).  There is also an ongoing debate among the members of this Bench.  *Compare Nuskey*, 06-cv-1573, slip op. at 5–6; *with Beckford v. Geithner*, 661 F. Supp. 2d 17, 25 n.3 (D.D.C. 2009).  The question is whether *Gross v. FBL Financial Servs. Inc.*, 129 S. Ct. 2343 (2009), a case involving a claim of discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, affects the analysis of Title VII's retaliation provision.

A little background will put the current debate into focus.  The Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), "addressed the proper allocation of the burden of persuasion" in Title VII cases "when an employee alleges that he suffered an adverse employment action because of both permissible and impermissible considerations — *i.e.*, a 'mixed-motives' case." *Gross*, 129 S. Ct. at 2347.  *Price Waterhouse* first recognized mixed-motive cases and then established two important principles: (1) Title VII forbids discrimination "because of" gender, race,

religion, etc., which means, when there are mixed motives, that an employee must prove by a preponderance of the evidence that discrimination was a substantial or motivating factor in the employer's decision, even though lawful motives also existed;[9] but (2) it is a complete defense if the employer thereafter persuades the jury by a preponderance of the evidence that it would have taken the same action without regard to discriminatory animus. *See Price Waterhouse*, 490 U.S. at 252–53, 258. Congress approved the first of these points, but not the second.

In response, Congress amended Title VII to "explicitly authoriz[e] discrimination claims in which an improper consideration was 'a motivating factor' for an adverse employment decision." *Gross*, 129 S. Ct. at 2349; *see* 42 U.S.C. § 2000e-2(m) ("an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice"). To address the second point, Congress added 42 U.S.C. § 2000e-5(g)(2)(B), providing that, in a case under 42 U.S.C. § 2000e-2(m) (a mixed-motive case), if the employer proves by a preponderance of the evidence that it would have taken the same action without regard to an impermissible motivating factor, the plaintiff is entitled only to declaratory relief, limited injunctive relief, and attorneys' fees and costs, but not to damages or reinstatement. *See* 42 U.S.C. § 2000e-5(g)(2)(B); *see also Ginger v. District of Columbia*, 527 F.3d 1340, 1345

---

[9] A case involving a mixed motive arises when an employer has both a legitimate reason (such as poor work performance) and an illegitimate reason (discriminatory animus) for an adverse action. *See Gross*, 129 S. Ct. at 2347. It is *not* when an employer has two illegitimate reasons. *See Cross v. Small*, Civ. Act. 04-1253, Mem. Op. [Dkt. # 123] (Mar. 11, 2010) at 1–2; *but see Gross*, 129 S. Ct. at 2355 (noting that *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 613 (1993), "indicated the 'possibility of dual liability under ERISA and the ADEA where the decision to fire the employee was motivated both by the employee's age and by his pension status,'— a classic mixed-motives scenario." (Stevens, J., dissenting)).

(D.C. Cir. 2008); *Fogg v. Gonzalez*, 492 F.3d 447, 451 (D.C. Cir. 2007).

When Mr. Gross sued FBL Financial Services, he alleged that age discrimination was a motivating factor in his job change/demotion; the district court gave jury instructions that were consistent with the plurality opinion in *Price Waterhouse*. *See Gross*, 129 S. Ct. at 2347 (noting that the jury was instructed to return a verdict for Mr. Gross "if he proved, by a preponderance of the evidence, that FBL 'demoted [him] to claims projec[t] coordinator' and that his 'age was a motivating factor' in FBL's decision to demote him."). The jury returned a verdict in Mr. Gross's favor. *Id*. The Eighth Circuit Court of Appeals reversed, finding that the jury instructions were infirm. *Id*. That Circuit followed the opinion of Justice O'Connor in *Price Waterhouse*, in which she had stated that "in order to justify shifting the burden on the issue of causation to the defendant, a disparate treatment plaintiff must show *by direct evidence* that an illegitimate criterion was a substantial factor in the [employment] decision." *Price Waterhouse*, 490 U.S. at 276 (O'Connor, J., concurring) (emphasis added). The Supreme Court vacated the Eighth Circuit's decision and remanded. *Gross*, 129 S. Ct. at 2352.

In a 5-4 opinion authored by Justice Thomas, the High Court could not "ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the ADEA." *Id*. at 2349. Because of these new "textual differences between Title VII and the ADEA," the Court found itself prevented "from applying *Price Waterhouse* and *Desert Place* [*Inc., v. Costa*, 539 U.S. 90 (2003)] to federal age discrimination claims." *Id*. at 2349 n.2. "The ADEA provides, in relevant part, that '[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age.'" *Id*. at 2350

-17-

(quoting 29 U.S.C. § 623(a)(1)) (emphasis in original). "[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Id*. Thus, the Supreme Court concluded that to "establish a disparate-treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Id*. In the end, "the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action. A plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Id*. at 2351.

Given the similarity between the language in the ADEA ("because of") and the retaliation provision of Title VII ("because"), "the *Gross* reasoning could be applied in a similar manner" to cases alleging retaliation under Title VII. *Smith*, 602 F.3d at 328.[10] Nonetheless, the Fifth Circuit in *Smith v. Xerox* declined to apply the *Gross* reasoning because the Supreme Court has not reversed *Price Waterhouse*. *Id.* at 330 ("It is not our place, as an inferior court, to renounce *Price Waterhouse* as no longer relevant to mixed-motive retaliation cases, as that prerogative remains always with the Supreme Court."); *but see id.* at 338 n.4 ("*Price Waterhouse* addresses Title VII's

---

[10] The retaliation provision in Title VII still reads:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . *because* he has opposed any practice made an unlawful employment practice by this [subchapter], *or because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [subchapter].

42 U.S.C. § 2000e-3(a) (emphasis added).

discrimination provision, *not* Title VII's retaliation provision.") (Jolly, J., dissenting) (emphasis in original).

Judge Jolly filed a dissent in *Smith v. Xerox Corp.* He applied *Gross* to conclude that "the mixed-motive analysis is no longer applicable outside of Title VII discrimination, and consequently does not apply to this retaliation case" under Title VII. *Id.* at 336 (Jolly, J., dissenting). Judge Jolly wrote:

> A careful and fair consideration of the principles underlying the decision in *Gross* would require the majority to grapple with two realities that mirror the very basis for the decision in *Gross*: (1) Title VII's retaliation section, at issue here, lacks the provision of Title VII's discrimination section that allows mixed-motive cases, and (2) Congress neglected, in 1991, to provide for motivating factor causation in Title VII retaliation even though it amended Title VII in other ways. . . .
>
> The Supreme Court explained that the "careful[ly] tailor[ed]" amendments made to Title VII in 1991 should be read as *limiting* the mixed-motive analysis to the statutory provision under which it was codified — Title VII *discrimination* only, which excludes *retaliation*, the claim here. As the Supreme Court admonished, to read the 1991 amendments as generally blessing the *Price Waterhouse* analysis would "ignore Congress' decision" to provide motivating factor causation in only specific types of cases, not in all cases.[11]

*Id.* at 337–38 (Jolly, J., dissenting) (emphasis in original) (citations omitted). Judge Jolly invoked the reasoning of the Seventh Circuit which has "*twice* explained, after *Gross*, [that] 'unless a statute . . . provides otherwise, demonstrating but-for causation is part of the plaintiff's burden *in all suits*

---

[11] The *Gross* Court reasoned that Congress intended to limit *Price Waterhouse* to mixed-motive claims under Title VII since Congress specifically codified motivating factor liability in 42 U.S.C. § 2000e-2(m). The Court found that if Congress wanted the mixed-motive analysis to apply outside of Title VII, it would only have added the provision eliminating an employer's complete defense to these claims, 42 U.S.C. § 2000e-5(g)(2)(B). Because of the absence of a parallel provision to § 2000e-2(m) in the ADEA, the Court concluded that the mixed-motive analysis of *Price Waterhouse* did not apply. *Gross*, 129 S. Ct. at 2351 n.5.

*under federal law.'" Id.* at 337 (emphasis in original) (quoting *Serwatka*, 591 F.3d at 961) (ADA);[12]

*see also Fairley v. Andrews*, 578 F.3d 518, 52–56 (7th Cir. 2009) (42 U.S.C. § 1983).

Congress approved the "motivating factor" analysis from *Price Waterhouse* when it amended Title VII in 1991 to adopt that standard explicitly for mixed-motive cases. *See* 42 U.S.C. §2000e-2(m). Now the Supreme Court has held that the failure to extend that language to the ADEA returns the reading of the ADEA to its "ordinary meaning" whereby "because of" means "age was the 'reason' that the employer decided to act." *Gross,* 129 S. Ct. at 2350 (citation omitted). The question is whether to extend the *Gross* analysis to Title VII's retaliation provision. The answer is both yes and no, depending on a plaintiff's allegations and the evidence.

This Court concludes that § 2000e-2(m) means just what it says: when an impermissible motive animates "*any* employment practice," even though permissible motives were also involved, "an unlawful employment practice is established." 42 U.S.C. § 2000e-2(m) (emphasis added). There can, therefore, be mixed-motive retaliation cases despite the "because" language in the statute.[13] In a mixed-motive case, a successful employee must prove an illegal motive behind the employer's action; if the employer then proves that it would have taken the same action without regard to the illegal motive, the employee's recovery is limited to declaratory judgment, an injunction against further violations, and attorneys' fees. *See* 42 U.S.C. § 2000e-5(2)(B).

---

[12] Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213 (2000).

[13] Several circuit courts have come to the conclusion that 42 U.S.C. § 2000e-2(m) does not apply to retaliation claims. *See, e.g., Woodson v. Scott Paper Co.*, 109 F.3d 913, 933–35 (3d Cir. 1996); *Tanca v. Nordberg*, 98 F.3d 680, 682–85 (1st Cir. 1996); *Marbly v. Rubin*, Civ. No. 98-1846, 1999 U.S. App. LEXIS 19736, *6 n.2 (6th Cir. 1999) (noting that other circuit courts have declined to extend 42 U.S.C. § 2000e-2(m) to retaliation cases). The D.C. Circuit, however, has not addressed the question. *See Borgo v. Golden*, 204 F.3d 251, 255 n.6 (D.C. Cir. 2000).

This stands in contrast to the situation in which an employee alleges disparate treatment based on a single motive. As indicated above, an employer can defend by advancing a legitimate, non-discriminatory reason and the employee bears the ultimate burden of proving pretext. In such a case, the employee/plaintiff does not need to prove motive. The *Gross* analysis fits such a single-motive case: an employee must prove that "but-for" his or her protected status, the employer would not have taken the adverse action. This is commonly accomplished by demonstrating that the so-called legitimate, non-discriminatory reason given by the employer is pretextual, leading to an inference of illegal discrimination. This single-motive analysis and its "but-for" burden of persuasion can apply to both disparate treatment and retaliation cases, even though the scope of actions that may be retaliatory is broader.

The fact that *Price Waterhouse* has not been overruled is not determinative, because, as amended, Title VII does not present an either/or choice. Congress has decreed that a mixed motive infects any employment practice barred by Title VII just as straight-up discrimination does. The differences lie in the nature of the proofs and in the remedies.

Ms. Beckham alleges that "because of her race" and "because of her opposition to actions made unlawful by Title VII," Amtrak discriminated against her in the ways discussed above. *See* Compl., Counts I, II. These allegations and the evidence presented by the parties on summary judgment demonstrate that this is a "single motive" Title VII case. Therefore, to avoid summary judgment in Amtrak's favor, Ms. Beckham must present facts from which a reasonable jury could conclude that "but-for" her race, Amtrak would not have acted in the way she claims.

# III.  ANALYSIS

## A. Alleged Race-Based Discrimination

In order to constitute an adverse action that is subject to redress under Title VII, an employee must experience, due to her protected status, a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).  "[M]ere idiosyncracies of personal preference are not sufficient to state an injury.  Purely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions." *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002) (internal citations omitted). Therefore, "[a]n employment action does not support a claim of discrimination unless it has 'materially adverse consequences affecting the terms, conditions, or privileges of [a plaintiff's] employment . . . such that a reasonable trier of fact could find objectively tangible harm." *Ginger*, 527 F.3d at 1343 (omission in original) (quoting *Forkkio*, 306 F.3d at 1131).

Despite the admonition in *Brady v. Office of the Sergeant at Arms* that district courts should not pause to examine whether a plaintiff established a *prima facie* case when an employer offers a legitimate, non-discriminatory reason for its actions, Amtrak protests strongly that none of the alleged "adverse actions" identified by Ms. Beckham was sufficiently serious to support a discrimination claim or to have had any harmful impact upon her at all.  Therefore, the Court will analyze whether Ms. Beckham's claims involve an adverse employment action. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (proceeding directly to the *Brady* analysis may be premature and courts should first assess whether there is evidence of an adverse action where that

fact is contested).

Ms. Beckham contends she suffered three adverse actions: denial of tuition reimbursement for her master's degree courses; denial of Dreamweaver II training; and denial of the ability to telecommute, while other White employees were allowed such opportunities. The record does not support these allegations. There is no evidence to support the entirely subjective argument that Amtrak's decisions to deny tuition reimbursement, deny Dreamweaver II training, or deny requests to work from home imposed such materially adverse consequences that one or more of such decisions affected the terms, conditions or privileges of her employment. *See Ginger*, 527 F.3d at 1343 (noting that an employment action does not support a claim of discrimination unless it has materially adverse consequences affecting the terms, conditions, or privileges of employment).

Ms. Beckham argues that she worked as Program Manager over the Amtrak Transportation Department Review System, a large IT program, and that one of the requirements of her position under the "Essential Functions" of the job description was that she "have the capability of functioning as a website administrator." Opp'n., Ex. 2 (Position Description). Further, she contends that the ability to function competently as a website administrator and have proficiencies in HTML, FrontPage and other software programs was a requirement of the position. *See* Opp'n. at 8, *id*. Thus, Ms. Beckham felt that the master's degree program was connected to her duties.

Amtrak contends that the Position Description that Ms. Beckham attaches to her opposition brief is inapplicable to any issue in this case because it is a Position Description for a Program Manager, which was not Ms. Beckham's job at the relevant time in 2004. Amtrak notes that the Position Description submitted by Ms. Beckham is dated May 2005, some nine months after her request for tuition reimbursement as a Senior Analyst. Amtrak also notes that all Internet

functions for the Service Standards Manual were new functions in the job, added by Mr. Nogar in late 2004 just before hiring Ms. Sloane and Mr. Fox, but not performed by Ms. Beckham, who oversaw the intranet. *See* Def.'s Mem. at 5 n.2. In fact, Ms. Beckham testified that she was a Senior Analyst from 2002 through 2007. *See* Beckham Dep. at 13–14;[14] *see also* Compl. ¶ 4 ("[Ms. Beckham's] current job title [as of January 29, 2008, when the Complaint was filed] is Senior Analyst . . . ."); *id*. ¶ 6 ("Currently, Ms. Beckham is a Senior analyst in the office of Service Standards."); Def.'s Mot. to Dismiss [Dkt. # 5], Ex. 1 (EEOC Charge dated January 26, 2006) ("I am employed with Respondent as a Senior Analyst."). When Ms. Beckham applied for tuition reimbursement for a master's degree in "Business and Technology Management" on July 20, 2004, Def.'s Mem., Ex. 8 (Educational Assistance Application), she was a Senior Analyst and not a Program Manager.[15] The Court concludes that the submitted Position Description is not relevant to

---

[14] "Q. And in approximately what year was this that you assumed the senior analyst job? A. It may have been 2002. . . . Q. Okay. How long did you hold or have you held the senior analyst position? A. Until 2007, I believe. 2007.").

[15] Ms. Beckham does not know when her title changed but it was clearly after Amtrak denied her request for reimbursement for master's degree studies:

> Q. You as an employee of Amtrak, did you have the same title after the Villa Julie course work reimbursement was denied?
> A. No, I did not have the same title.
> . . .
> Q. And when did that title change occur?
> A. I have no idea.
> Q. Okay. So you don't know if it was around the time of this denial?
> A. I know that it was changed.
> Q. At some point subsequent?
> A. That is correct.

Beckham Dep. at 53.

Amtrak's denial of tuition reimbursement for a master's degree program.[16]

It is undisputed that Amtrak paid tuition reimbursement for Ms. Beckham's Bachelor of Arts degree while Mr. Nogar was her supervisor. Amtrak also paid tuition reimbursement for other courses including at least two writing courses and an Adobe Photoshop course, which Ms. Beckham enrolled in without pre-approval. Ms. Beckham testified that Amtrak's decision not to approve reimbursement for master's level courses at Villa Julie had no deleterious impact on her working conditions in Service Delivery, her compensation as a technical writer, or any other benefits of employment in the department. *See* Beckham Dep. at 53–54. "[N]ot everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (internal quotation marks omitted). There is nothing in the record to suggest that Amtrak's denial of Ms. Beckham's request for tuition reimbursement adversely impacted any terms or conditions of her employment

---

[16] Ms. Beckham's Declaration and arguments contend that her relevant job title was not "Senior Analyst" but rather "Program Manager, Service Standards and Operations" where she managed the Transportation Department Review System and worked closely with Amtrak's IT department. *See* Opp'n. at 8; Beckham Decl. ¶ 6–7. Virtually every circuit, including the D.C. Circuit, has recognized the principle that a party cannot create a material fact in dispute by submitting an affidavit that conflicts with earlier sworn testimony in order to preclude summary judgment. *See Pyramid Sec., Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) (collecting cases); *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (this principle is called the "sham affidavit rule"; a party may create an issue of material fact with contradicting testimony only if she can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony). Ms. Beckham does not offer a persuasive reason or clarification for the inconsistency in her testimony with regards to her job title. Thus, the Court may properly grant the motion despite the conflict. *See id.* Furthermore, while Ms. Beckham's job position may have been "Program Manager," as she states, at the time she executed her Declaration on June 7, 2008, *see* Beckham Decl., the critical issue is her job position at the time she applied for tuition reimbursement on July 20, 2004; as to this fact, the Court finds no dispute.

or that she was treated differently from any other Service Delivery employee. In fact, no Service Delivery employee had been approved for reimbursement for an advanced degree in at least eleven years.

Ms. Beckham also contends that denial of Dreamweaver II training was an adverse employment action. Amtrak argues that none of Ms. Beckham's duties required knowledge of Dreamweaver II, which is applicable to the functions of an external website, as Ms. Beckham's primary function was technical writing and her auxiliary function was maintaining the intranet. Def.'s Mem. at 21–22; Nogar Dep. at 95–96. The Court recognizes that Ms. Beckham and Amtrak disagree as to the relevance of Dreamweaver II to Ms. Beckham's duties. But "denial of training opportunities is only actionable if there is a resultant 'material change . . . in employment conditions, status, or benefits.'" *Dorns v. Geithner*, 692 F. Supp. 2d 119, 133 (D.D.C. 2010) (quoting *Lester v. Natsios*, 290 F. Supp. 2d 11, 29 (D.D.C. 2003)). Therefore the "denial of training may rise to the level of an adverse employment action," *Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001), but the denial must "result[] in a tangible harm." *Everson v. Medlantic Healthcare Group*, 414 F. Supp. 2d 77, 84 (D.D.C. 2006). The alleged harm on which Ms. Beckham focuses is the supposed different treatment of two similarly situated co-workers: Ms. Beckham and Mr. Fox. But Ms. Beckham and Mr. Fox were not similarly situated because he was developing a new Internet site and she was overseeing the content on an existing intranet. In addition, Ms. Beckham fails to show any legally cognizable adversity that she suffered stemming from denial of access to one particular training course. It is clear that Ms. Beckham is unhappy that she did not attend Dreamweaver II, but there is an absence of evidence from which a reasonable jury could find tangible harm.

Ms. Beckham contends that Amtrak denied her the ability to telecommute approximately three times while others who were White were given this benefit. *See* Beckham Dep. at 59 ("Q. How often did you request [to work from home]? A. About three times."). Ms. Beckham averred that she "was never allowed to telecommute but believes Russell Fox was." Pl.'s Disputed Facts ¶ 6; Beckham Dep. at 63–64. Ms. Beckham further testified in deposition that Mr. Fox admitted to her that he was allowed to work from home because of personal business. Beckham Dep. at 64. However, Ms. Beckham did not contest Amtrak's arguments concerning her work-at-home record in her opposition brief and the Court considers the matter conceded. *See* LcvR 7(h) (facts set forth in motion for summary judgment are admitted if not controverted in response); *see also FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). Furthermore, Ms. Beckham admits that Amtrak approved her requests for a different work schedule or location in the past. *See* Beckham Dep. at 65; *see also* Sloane Dep. at 74. Being denied the ability to work from home on, at most, three occasions is a minor annoyance, not an adverse action. Ms. Beckham suffered no cognizable injury or harm from Amtrak's challenged employment actions and her claim of discrimination based on disparate treatment fails.

## B. Alleged Retaliation

Ms. Beckham also contends that Amtrak retaliated against her for engaging in protected activity due to her involvement as a named plaintiff in the 1998 *McLaurin* class action. It is undisputed that her involvement in a class action constituted protected activity. *See* Def.'s Mem. at 23 n.8. Measured from when the last order dismissing *McLaurin* was entered on November

26, 2004, Amtrak's challenged actions in July 2004 and the Spring of 2005 might be close enough in time to support an inference of discrimination. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding that a plaintiff may rely on temporal proximity to prove causation, but such proximity must be "very close").[17]  The Court makes no findings of fact or legal conclusions on this point, however, because Ms. Beckham fails to argue it and no details about the suit or its resolution are provided in the record.

Ms. Beckman relies on the same three denials of tuition reimbursement, Dreamweaver II training, and telecommuting to allege retaliation based on her protected conduct. The legal questions are (1) whether Ms. Beckham has presented evidence from which a jury could conclude that her prior protected activity was the "but-for" reason for these Amtrak decisions, *i.e.*, were she not a *McLaurin* class member, Amtrak would have approved these requests, *see Gross*, 129 S. Ct. at 2353; and (2) whether Ms. Beckham has presented evidence from which a jury could conclude that a reasonable employee would have found the denials of her requests materially adverse so as to dissuade such employee from future protected activity. *See Burlington N.*, 548 U.S. at 68.

Ms. Beckham offers no facts to support her contention that the denial of tuition reimbursement and Dreamweaver II training was "because of" her participation in a class action that settled in 1999 with a consent decree that continued in effect until 2004.  Instead, she accuses Amtrak and Mr. Nogar of "mendacity" based on the 2005 Position Description for a job that Ms. Beckham, by affidavit, says was hers at some unspecified time but which her EEOC Charge, her

---

[17] Time lags of more than three months can be too long to show retaliatory causation. *Breeden*, 532 U.S. at 273–74 (20-month lag too long to demonstrate causation, citing with approval *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (3-month lag too long)); *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 94 (D.D.C. 2004) (same).

Complaint, and her deposition testimony demonstrate was not her job at the relevant time. *See* Compl. ¶¶ 4, 6; Beckham Dep. at 14; Def.'s Mot. to Dismiss [Dkt. # 5], Ex. 1 (EEOC Charge dated January 26, 2006). Even were the proffered Position Description applicable to Ms. Beckham in 2005, in contradiction to the 2006 EEOC Charge and the 2008 Complaint, it was *not* her position when she requested tuition reimbursement in July 2004. *See supra* n.16. Amtrak's Educational Assistance Program required advanced degrees to be related to an employee's *current* job. The perceived relevance of the master's degree course work to Ms. Beckham's management of the Transportation Department's Review System, in or after 2007, does not make that connection. Thus, Ms. Beckham fails to show any evidence from which a jury might find that "but-for" her participation in *McLaurin*, Amtrak would have paid for her master's degree courses.

Amtrak has also proffered a legitimate non-discriminatory reason for its denial of Dreamweaver II training: Ms. Beckham's work duties did not include the Internet website and the intranet, for which she was responsible, was not based on Dreamweaver. Except for her accusation of "mendacity" connected to the irrelevant Position Description, Ms. Beckham offers nothing to support her burden of persuasion that her involvement in *McLaurin* was the "but-for" reason that Amtrak denied her a second Dreamweaver training course. Notably, Ms. Beckham makes no argument that the Dreamweaver II training was relevant to her position as a Senior Analyst, the job she actually held at the relevant time. Summary judgment is properly granted against a party who "after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Ms. Beckham relies solely on allegations of mendacity and conclusory statements, which are insufficient to withstand summary judgment. *Greene*, 164 F.3d

-29-

at 675. The Court recognizes there could well be fact patterns in which the denial of tuition reimbursement and/or specialized computer training would be materially adverse and could dissuade an employee from further protected conduct. But no such fact pattern is shown here.

Ms. Beckham further, and lastly, offers no basis to conclude that her membership in the *McLaurin* class played any part in Amtrak's request to Mr. Fox that he work at home occasionally on a project requiring a quiet work environment or its denial of her request to work from home on one to three occasions, much less that "but-for" her participation in the lawsuit, Mr. Fox would have been required to work in a noisy area with interruptions and/or that she would have been able to stay at home. Certainly, the occasional denial of a request to work from home, when other requests from the same employee have been granted, does not constitute a materially adverse action. As Ms. Beckman makes no rejoinder to Amtrak's arguments on these points, they are conceded. *See* LCvR 7(h); *FDIC v. Bender*, 127 F.3d 58. For these reasons, Ms. Beckham's claims of retaliation fail.

## IV. CONCLUSION

The Court will grant Amtrak's motion for summary judgment [Dkt. # 35]. The direct discrimination claim fails for lack of a true adverse action. The retaliation claim fails for lack of evidence. A memorializing Order accompanies this Memorandum Opinion.

Date: September 9, 2010                    _____/s/_____
                                          ROSEMARY M. COLLYER
                                          United States District Judge